**Dolores J. FUKA, Plaintiff–Appellant,**

v.

**THOMSON CONSUMER ELECTRONICS, Defendant–Appellee.**

**No. 95–1190.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 12, 1995.

Decided May 6, 1996.

Patricia M. Higgins (argued), Nagle & Higgins, Naperville, IL, for plaintiff–appellant.

Bruce R. Alper (argued), Malory N. Harriman, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for defandant–appellee.

Before POSNER, Chief Judge, and MANION and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

In January 1992, Thomson Consumer Electronics ("Thomson") terminated Dolores J. Fuka's employment as a customer service representative ("CSR"). She responded with this lawsuit under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, alleging that her termination resulted from unlawful age discrimination. The district court entered summary judgment for Thomson, finding that Fuka had not presented any direct evidence of age discrimination, had not established that she was meeting Thomson's legitimate expectations at the time of her termination, and had not shown that the stated reason for her discharge was pretextual. In this appeal, Fuka challenges each of those conclusions, but we agree with the district court and therefore affirm its judgment.

## I.

Fuka was hired as a CSR by a division of General Electric in November 1987. The following month, that division was purchased by Thomson, a consumer electronics manufacturer, which retained Fuka in her former position. At that time, Fuka was forty-six years old.

Fuka worked at Thomson's office in Oak Brook, Illinois, which housed the company's telemarketing and customer service functions. Thomson assigned to her a small work station equipped with a telephone and a computer. Fuka initially serviced international accounts, and she was primarily responsible for answering the telephone, accepting orders, and providing price, product availability, and order and account information to existing and prospective customers. As an international CSR, Fuka spent most of her work day on the telephone taking or following through on international orders. Between 1987 and 1991, Fuka was periodically reviewed by her supervisor George Silva, who generally rated her performance as "effective." In his written reviews for two of those years, however, Silva noted that Fuka's "attitude toward work" needed improvement.

In April 1991, Thomson transferred all of the international and some of the national accounts handled in Oak Brook to its Indianapolis office. Fuka and three other international CSRs were therefore reassigned to non-key domestic accounts. With Fuka's new assignment came a new supervisor, Kevin George, who like Silva reported to Mike

Sparkman, manager of the Oak Brook office. Fuka's responsibilities remained essentially the same in her new assignment but with different accounts. Along with five other CSRs, Fuka now had responsibility for non-key accounts in New York, Boston, and Atlanta.

From the very beginning, Thomson had used its computer system to monitor incoming calls to its Oak Brook office and the availability of CSRs to answer those calls. Thomson's system also enabled management to determine how many incoming calls "abandoned" or went unanswered in a particular CSR group over a thirty-minute period. In 1991, Thomson obtained the capability to also monitor outgoing calls. In April or May of that year, George notified the CSRs in his group that he would begin distributing a monthly report of outgoing calls and that each CSR should identify personal calls included on the report. He indicated that as a guideline, personal calls should not exceed ten minutes in length except under extenuating circumstances. Fuka understood that the company's purpose in limiting the length of personal calls was to ensure that CSRs were available to answer incoming business calls. Fuka considered the ten-minute guideline to be a reasonable expectation.

For the first two months that Thomson monitored outgoing calls, the monthly reports revealed that Fuka had made five personal calls exceeding ten minutes in April and nine such calls in May. Sometime in May or June, George expressed concern to Fuka about the length of some of her personal calls. George asked Fuka to keep those calls under ten minutes unless there were extenuating circumstances. Fuka explained to George that most of her personal calls were to her elderly mother, and George suggested that she call her mother more frequently but for only two to three minutes at a time. George and Fuka had a similar conversation near the end of June about the May telephone report, which showed that Fuka had made nine extended personal calls.

These conversations had an impact, as the June report showed that Fuka had made only one extended personal call.

The monthly reports for July, August, and September, however, revealed that Fuka had made five, four, and then eleven extended calls in those months. In mid-November, George spoke to Fuka about the number of calls reflected on those reports. He indicated that Fuka was abusing her privilege to make personal calls from her work station, and Fuka responded that she would begin to make her personal calls from the pay phone down the hall. George purports to have told Fuka that this would only exacerbate the problem, but Fuka denies that George ever objected to her use of the pay phone. She acknowledges, however, that long personal calls, regardless of where they were made, would make her unavailable to answer business calls.

On December 23, 1991, George and Fuka met to discuss Fuka's year-end performance review.[1] George prepared that review, and Sparkman had already approved it. George rated Fuka's overall performance as "marginal," and he assigned to her the lowest possible rating in two categories—"budgets time effectively" and "displays a positive attitude toward work." In the "manager's comments and conclusions" section, George wrote the following:

> Dee possesses superior skills necessary for the customer service position. However, Dee has chosen not to utilize these skills since moving over from International Customer Service. . . . Dee has a bad attitude much of the time. Pouts when she chooses not to participate. Is a chronic complainer and is a disruptive element in the work area. Since May I have discussed her ABUSE regarding the length of personal phone calls. No improvement noted. She apparently has no regard for her supervisor's wishes. . . . She auxes out [deactivates her telephone] for long periods without approval or notification to others. She

1. In the interim, the monthly telephone report for October had been generated, and it showed that Fuka had made nine extended personal calls. The record does not reveal how many extended personal calls Fuka made in November, as Thomson was unable to produce in discovery the report for that month. Fuka maintains that she made no personal calls exceeding ten minutes in November, and we shall assume that to be true at this stage of the proceedings.

remains on personal calls while incoming calls abandon. She takes lunches beyond the 45 minutes allowed. Her sick days are excessive without a specific illness to attribute it to and are most notably on Mondays or Fridays.... Dee's performance is unsatisfactory and must improve dramatically. This is a condition of her continued employment at [Thomson]. Dee's progress, or lack thereof, should be evaluated monthly until a significant and lasting improvement has been established. If improvement is not forthcoming, dismissal is recommended. The tragedy here is that Dee could be and should be a top performer but has willfully chosen an alternate road.

(R. 19–2, Ex. D.) Fuka refused to sign the review and responded in writing on January 10, 1992, disputing nearly every criticism leveled against her. Fuka asserted that ninety-five percent of her review "was fabrication, or at least misconception, possibly due to the reviewer's lack of experience in a supervisory capacity." (*Id.*) By the time Fuka submitted her response, however, George was no longer her supervisor, having relocated to Indianapolis on January 2. Silva replaced George as Fuka's supervisor at that point.

On Friday, January 10, Fuka received a personal call from a friend relating to a problem she had been having with her car. After she had been on the line for some time, Silva approached her work station and asked if the call was a personal one. Fuka admitted that it was, which prompted Silva to respond, "Dee, if you want me to help you, you'll have to get off the phone." [2] According to Fuka, that was the end of their exchange, but Silva sent Sparkman an e-mail message the following Monday that described the encounter in this way:

> [O]n Jan. 10, 1992, [I] had a conversation with DEE FUKA regarding a personal call she had received. [I] asked if she had just received a personal call and she said yes. [I] asked her if she knew how long she had taken and she replied a couple of minutes. [W]hen [I] told her she had been on this call for 24 minutes she said she didn't

realize it had been that long. [I] told her this conversation was free and if she wanted me to work with her she would have to improve her work habits and show more enthusiasm toward her job. [I] asked her if she was unhappy with her job and if so she should look elsewhere. [S]he said she wasn't unhappy and that she needed this job. [S]he said she had some personal problems outside of the office and [I] told her that her attitude reflected this and she would have to find some wa[y] to separate the two. [S]he also said she had asked her mother and friends to stop calling her at the office.

(R. 19–2, Ex. A (Fuka Dep. Ex. 15).)

On that Monday, Silva was out of the office, and Sparkman asked William Karr, another Oak Brook supervisor, to "keep an eye" on Fuka and to notify him if she left her desk. At approximately 2:00 p.m., Fuka auxed off her telephone in order to use the restroom and then the pay phone down the hall. As requested, Karr reported these events to Sparkman, noting as well that incoming calls were going unanswered and abandoning in Fuka's group. Fuka was gone from her desk for approximately twenty minutes, and when she returned, Karr told her that Sparkman wanted to see her in his office. Sparkman explained to Fuka that he had studied her performance review and that he had come to the conclusion that her performance could not improve. He therefore asked Fuka to resign. When she refused, Sparkman sent her home and indicated that he would call her the following day after considering the matter further.

Sparkman consulted with his Indianapolis supervisor and a human resources manager before deciding to terminate Fuka's employment. In reaching that decision, Sparkman relied on Fuka's December 23, 1991 performance review, on her documented practice of making extended personal calls in the face of warnings from Thomson management, and on the January 13 incident where Fuka had been found on the pay phone while incoming

---

**2.** Fuka had complained to Silva earlier in the week that her year-end performance review, and particularly its criticism of her personal phone use, had been unfair.

calls abandoned.[3] Sparkman communicated his decision to Fuka the following day. At the time of her termination, Fuka was fifty years old.

Fuka then filed an age discrimination charge with the Illinois Department of Human Rights ("IDHR") and the EEOC. After investigating her charge, the IDHR dismissed the claim for lack of substantial evidence. The EEOC adopted that decision and issued Fuka a right-to-sue letter. She then initiated the instant action in federal court. Conceding that neither George nor Sparkman ever referenced her age in complaining about her personal telephone use, Fuka bases her claim on discriminatory statements she attributes to those supervisors in the months preceding her termination. She also contends that younger CSRs with similar performance problems were treated more favorably by Thomson management.

In granting Thomson's motion for summary judgment, the district court found that the direct evidence of age discrimination proffered by Fuka was not persuasive. The court concluded that even if George and Sparkman had made the age-based comments, Fuka had not established a link between those remarks and the subsequent decision to terminate her employment. As a result, Fuka could only establish her claim by relying on the indirect method of proof. The court found that Fuka's claim failed on that score for two reasons. First, Fuka could not establish a prima facie case because she could not show that she was performing to Thomson's legitimate expectations at the time of her termination. Alternatively, assuming a prima facie case, the court found that Fuka had not created a material issue of fact as to whether the stated reason for her discharge was pretextual. *See Fuka v. Thomson Consumer Elec.*, No. 93 C 7754, 1994 WL 702618 (N.D.Ill.Dec.14, 1994).

## II.

■ We review the district court's grant of summary judgment de novo, construing the evidence in the light most favorable to Fuka and according her the benefit of all reasonable inferences. *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir.1994). We will affirm summary judgment in an employment discrimination case only if the defendant would have been entitled to a directed verdict had the record before the court been that of a trial—in other words, only if judgment as a matter of law would have been appropriate because no reasonable jury could have returned a verdict for the plaintiff. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 70 (7th Cir.1995); *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1162 (7th Cir.1994). If, however, the plaintiff succeeded in presenting evidence from which an inference of discrimination could be drawn, summary judgment was improper and a trial is required. *See, e.g., Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677, 681 (7th Cir. 1996); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir.1994); *Shager v. Upjohn*, 913 F.2d 398, 401 (7th Cir.1990).

■ To succeed on a discrimination claim under the ADEA, a plaintiff must show that her termination or other adverse employment action would not have occurred "but for" her employer's motive to discriminate on the basis of her age. *See Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995); *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir.1994) (ultimate question in an age discrimination case is "whether the same events would have transpired if the employee had been younger than 40 and everything else had been the same"), *cert. denied*, —— U.S. ——, 115 S.Ct. 2612, 132 L.Ed.2d 855 (1995). Age discrimination, like other types, may be established in either of two ways— through direct evidence or via the indirect burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1122 (7th Cir.1994); *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir. 1993). Under either method, summary judgment is improper if the plaintiff offers

---

**3.** When he decided to terminate her employment, Sparkman did not yet know how many extended personal calls Fuka had made in December 1991.

The report for that month did not become available until January 17, 1992.

evidence from which an inference of age discrimination may be drawn. *See, e.g., Robinson,* 23 F.3d at 1165–66; *Shager,* 913 F.2d at 401–02.

## A.

■ Fuka first contends that she presented to the district court direct evidence that age played a role in Thomson's decision to terminate her employment. She points to two statements made by George and a third statement by Sparkman that allegedly reflect Thomson's discriminatory animus. George made the first statement in June 1991, more than six months before Fuka was terminated but after George had first warned her about the length of her personal calls. In the course of a meeting with Fuka and a co-worker, Susanne Petersson, George apparently indicated that he had received a large number of CSR applications, that one applicant had fifteen years of customer service experience, but that he preferred "young people fresh out of college" because those with experience "could not be molded." George allegedly reiterated this preference to Petersson later in 1991. Petersson attests that she sometimes was assigned the task of training new CSRs and that she had begun to notice that many of her trainees were having difficulty understanding inventory and warehouse procedures. She suggested to George that he occasionally hire a CSR with prior experience to balance things out, but that suggestion prompted George to respond, "No, I don't want older people, we want young people we can mold." Sparkman allegedly expressed a similar sentiment in a meeting with Karr and Silva in late 1991. According to Karr, Sparkman indicated that he could figure out the age of a CSR applicant by looking at the graduation date on her resume. He showed Karr and Silva a specific resume and said, "Looking at the gradua-

tion date, this one has to be at least 50 or more. We'll pass on that one." Fuka asserts, moreover, that her superiors' stated preference for youth was borne out by their hiring practices. Between 1990 and 1992, every CSR hired for Thomson's Oak Brook office was under forty years of age.[4] At the summary judgment stage, we must assume that George and Sparkman made the statements attributed to them, but we agree with the district court that those statements would not support a direct inference that age was a determining factor in Fuka's termination.

■ Following the Supreme Court's decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 277, 109 S.Ct. 1775, 1791, 1804–05, 104 L.Ed.2d 268 (1989) (plurality opinion and opinion of O'Connor, J., concurring in the judgment), this circuit has held that before seemingly stray workplace remarks will qualify as direct evidence of discrimination, the plaintiff must show that the remarks "were related to the employment decision in question." *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 686–87 (7th Cir.1991); *see also, e.g., Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 & n. 1 (7th Cir.1993); *Monaco,* 1 F.3d at 660; *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 569–70 (7th Cir.1989). If such proof is lacking, the remarks alone will not give rise to an inference of discrimination even when uttered by the ultimate decisionmaker. *Hong v. Children's Mem. Hosp.,* 993 F.2d 1257, 1266 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994); *Smith v. Firestone Tire and Rubber Co.,* 875 F.2d 1325, 1330 (7th Cir.1989).

As the district court observed, Fuka has been unable to show that the remarks of her superiors were in any way linked to Sparkman's subsequent decision to terminate her employment.[5] Each of the alleged state-

---

4. The record does not reveal how many of the applicants were over forty during that period.

5. We do not agree, however, that George's statements are only of "marginal relevance" in any event because George had been transferred to Indianapolis before the termination decision was made. (*Cf.* R. 32, Mem. Op. at 9.) Sparkman admits that he relied on Fuka's December 23, 1991 performance review in making his decision,

and George prepared that review. Thus, if Fuka could show that George had a discriminatory animus that could have affected his assessment of her performance, that animus may have tainted Sparkman's eventual decision even if George was by that point hundreds of miles away. *See Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1459 (7th Cir.1994); *Jardien v. Winston Network,*

ments revealed that age may have played a significant role when either George or Sparkman made a hiring decision, but Fuka has not shown that a similar age bias affected management's treatment of existing CSRs. *Cf. Robinson,* 23 F.3d at 1165 (statement by decisionmaker that employer would no longer be keeping its employees until they reached age sixty-five permits inference that age played a role in decision to terminate the plaintiff). Although Fuka established that Thomson consistently hired CSRs for its Oak Brook office who were under the age of forty, she was unable to dispute that she was the only CSR in the protected age group (out of approximately eighteen in Oak Brook) who was discharged or demoted in this period. She therefore failed to establish any nexus between the statements of her superiors and Sparkman's subsequent decision to terminate her employment. As a result, she has come forward with no direct evidence of discrimination that would enable her to survive summary judgment. *See, e.g., Randle,* 876 F.2d at 570.

### B.

 Fuka's claim under the *McDonnell Douglas* formulation fares no better. Under that approach, Fuka must first establish the four elements of a prima facie case: (1) that she was in the protected age group, (2) that she was performing to her employer's legitimate expectations, (3) that she was discharged or demoted, and (4) that younger employees were treated more favorably. *Collier v. Budd Co.,* 66 F.3d 886, 889 (7th Cir.1995); *Roper v. Peabody Coal Co.,* 47 F.3d 925, 926 (7th Cir.1995).[6] If she succeeds in establishing a prima facie case, a rebuttable presumption of discrimination arises, requiring Thomson to come forward with a legitimate non-discriminatory reason for her discharge. Once such a reason is offered, the presumption of discrimination dissolves, and Fuka must then show that the proffered reason is pretextual. *See, e.g.,*

*Taylor,* 69 F.3d at 779–80; *Robinson,* 23 F.3d at 1162. She may do so by producing evidence that the proffered reason is false, either because it has no basis in fact or because it did not actually motivate her discharge. *Collier,* 66 F.3d at 892; *Cliff v. Board of Sch. Comm'rs,* 42 F.3d 403, 412 (7th Cir.1994). If Fuka meets that burden, she need not also come forward with further evidence of intentional discrimination to survive summary judgment. Her proof would at that point be sufficient to support an inference that the company's real reason was discriminatory. *Weisbrot,* 79 F.3d at 681–82; *Anderson,* 13 F.3d at 1124; *Shager,* 913 F.2d at 401; *see also St Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).

 In applying those standards here, the district court granted summary judgment for alternative reasons—because Fuka had failed to establish a prima facie case and because she had not shown Thomson's proffered reason to be pretextual. Those alternative reasons are in reality the same, however, because both are based on Fuka's inability to rebut the performance deficiencies cited by Thomson in terminating her employment. Those deficiencies could defeat the second element of the prima facie case and at the same time represent the employer's unrebutted reason for its action. *See Troupe,* 20 F.3d at 736–37. Logically, of course, the prima facie case comes first, but we shall eschew a mechanistic application of *McDonnell Douglas* in this circumstance and proceed to consider whether Fuka met her burden of showing pretext. *See Taylor,* 69 F.3d at 781; *Anderson,* 13 F.3d at 1124 n. 4; *see also Shager,* 913 F.2d at 400–01.

Thomson purports to have fired Fuka because she had abused her telephone privileges by consistently making personal calls that exceeded ten minutes despite warnings about that practice from her supervisor. Fuka's repeated violation of the company's

---

*Inc.,* 888 F.2d 1151, 1155 (7th Cir.1989); *Shager,* 913 F.2d at 405.

**6.** With respect to the fourth element, the Supreme Court recently confirmed our view that the favored employees need not be outside the

protected class (i.e., under the age of forty) for the plaintiff to establish a prima facie case. *O'Connor v. Consolidated Coin Caterers Corp.,* —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); *see also Roper,* 47 F.3d at 927.

personal call guideline was important, Thomson explains, because it made her unavailable to answer business calls, which was her primary responsibility as a CSR. Fuka cannot very well show that Thomson's stated reason lacked an adequate basis in fact because the company's monthly telephone reports established the number of extended personal calls Fuka made from her work station. She conceded, moreover, that George spoke to her at least three and perhaps five times about reducing the length of her personal calls. The final warning came in her December 23, 1991 performance review, where George noted her unsatisfactory performance and recommended dismissal if improvement was not forthcoming. Fuka concedes, in fact, that Thomson's expectations of its CSRs in regard to personal telephone use were not unreasonable.

Because Thomson's concern with the length of her personal calls was thoroughly documented, Fuka attempts to show that her personal phone use had no actual impact on her ability to answer incoming business calls. She relies on a study of CSR productivity that her co-worker Petersson purports to have prepared for the years 1990 and 1991. Yet all we know of that study is included in the following two sentences of Petersson's affidavit: "I also did a study of CSR productivity and compared telephone records from 1990 and 1991 with prior years. I recall that Dolores Fuka was one [of] the CSRs who consistently handled an average to a higher than average volume of incoming calls." (R. 27, Ex. B at para. 9.) The study itself is not in the record, nor does Petersson's affidavit tell us anything more about its methodologies and findings. What we do know is certainly insufficient to create an issue of fact as to pretext, for it does not appear that the study even purports to address Thomson's particular concern with Fuka's personal telephone use. The study, then, is akin to the general statement of a co-worker that the plaintiff's job performance was adequate, the type of statement we have consistently found insufficient to stave off summary judgment when the employer has identified specific performance deficiencies. *See, e.g., Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460 (7th Cir.1994); *Anderson,* 13 F.3d at 1124–25;

*Williams v. Williams Elec., Inc.,* 856 F.2d 920, 924 (7th Cir.1988). Even if Fuka was able to answer an acceptable volume of incoming calls during 1991, she cannot dispute that at the same time, she was making an unacceptably high number of extended personal calls. The Petersson study therefore sheds no light on the honesty of Thomson's stated belief that this defect in her performance warranted dismissal. *See Russell,* 51 F.3d at 69.

Potentially more probative is Fuka's attempt to show that she was treated more severely by Thomson than similarly-situated CSRs who were younger. *See Troupe,* 20 F.3d at 736. Fuka specifically cites the situations of Mark Vanderohe, Joe Solis, and Vicky Wensel, all of whom were under forty and were allegedly plagued by similar performance problems. Fuka asserts, for example, that Vanderohe moonlighted as a "handyman" and that he made and received calls relating to this side business during work hours, which made him unavailable to answer incoming customer calls. Solis, moreover, allegedly used the company's toll-free telephone lines to make and receive extended calls from family members who lived out of state. Neither Vanderohe nor Solis were ever disciplined for this behavior, which Fuka asserts was comparable to her own. Yet even if both Vanderohe and Solis frequently used their business phones for personal calls, Fuka has provided no evidence that these co-workers had numerous (or even any) personal calls that exceeded ten minutes in length. As George explained to Fuka in May or June of 1991, Thomson was not so concerned about the number of personal calls a CSR made or received as it was about the length of those calls. Thus, Fuka's attempt to liken her situation to that of Vanderohe and Solis is unavailing. The evidence as to those two CSRs casts no doubt on Thomson's stated reason for terminating Fuka.

Yet Wensel's situation appears closer to plaintiff's, for Wensel too had difficulty keeping her personal calls under the ten-minute guideline. In addition to that, she also had difficulty arriving at work on time. Wensel's problems were so serious, in fact, that her supervisor (Karr) recommended that she be

terminated. Instead, Wensel was transferred to a group supervised by George, who adjusted her starting time to address the tardiness problem. Yet George too was concerned with the number of extended personal calls Wensel made. When the monthly reports revealed eight such calls in April 1991 and three more in May, George warned Wensel that he expected a significant improvement in her personal phone use. Thereafter, Wensel had two, three, six, and four extended calls in July, August, September, and October respectively. Between April and October, then, Wensel made approximately fourteen fewer extended calls than Fuka, but she too violated Thomson's ten-minute guideline on a consistent basis. In Wensel's December 20, 1991 performance review, George identified "tardiness" and "personal phone calls" as Wensel's two major shortcomings. He observed that Wensel had shown a slight improvement on the tardiness problem but that further improvement was required. Although he had previously discussed the personal call problem with Wensel, George noted that "no significant improvement ha[d] resulted." He therefore warned that if Wensel did not address her problem areas, "probation and dismissal will be the logical progression of events." (R. 19–2, Ex. D.) The monthly telephone report for December 1991, which was not generated until after Fuka's dismissal, showed that Wensel had made but one extended personal call in that month. A Thomson supervisor praised that improvement and urged Wensel to keep all of her personal calls under ten minutes.

We do not believe that Thomson's treatment of Wensel, considered against its treatment of Fuka, casts doubt on the stated reason for Fuka's termination. In fact, that evidence suggests that Thomson handled similar performance deficiencies in a consistent fashion. Although Wensel also made numerous extended personal calls on Thomson's time, she made fewer such calls than Fuka. Like Fuka, she was counseled by George in June 1991 and warned in her December performance review that improvement was necessary or dismissal could result. In contrast to Fuka, however, there is no evidence that Wensel had further problems after meeting with George to discuss her

review. Indeed, the December telephone report showed that Wensel made but one extended personal call in that month, and that call pre-dated her performance review. These facts sufficiently distinguish Wensel's situation from that of Fuka.

Fuka returns, finally, to the stated preference of her supervisors for hiring younger CSRs. Although we concluded above that the statements attributed to George and Sparkman were not direct evidence of age discrimination, it is possible that those statements, when considered in conjunction with other evidence, could support an inference of discrimination under the indirect, burden-shifting method. See Futrell v. J.I. Case, 38 F.3d 342, 347 (7th Cir.1994); Troupe, 20 F.3d at 736. The reasonableness of such an inference in any given case would of course depend on the nature of the allegedly discriminatory remarks, their relationship to the employment decision in question, the nature of the stated reason for the employer's action, and the existence of other evidence calling that reason into doubt. Here, we have no difficulty concluding that it would not be reasonable for a trier of fact to draw an inference of discrimination from the evidence Fuka proffered, including the alleged remarks of George and Sparkman. Standing alone, those remarks do not support a direct inference of discrimination (see supra, at 1403–04), and Fuka has come forward with no additional evidence that would, in conjunction with those remarks, suggest that the stated reason for her termination was false. See Weisbrot, 79 F.3d at 684–85, Rush v. McDonald's Corp., 966 F.2d 1104, 1116–18 (7th Cir.1992); Smith v. Firestone Tire and Rubber Co., 875 F.2d 1325, 1330 (7th Cir. 1989). Summary judgment was therefore proper.

## III.

Having reviewed all of the evidence in the light most favorable to Fuka, we agree with the district court that it is insufficient to support an inference of age discrimination under either the direct or indirect method of proof. Fuka simply has been unable to show that Thomson's stated reason for terminating her employment was false. We therefore

affirm the judgment entered in Thomson's favor below.

AFFIRMED.