Lisa Hillivi BROWN, Plaintiff,

v.

CITY OF AURORA, Defendant.

No. 95 C 2373.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 30, 1996.

Fred Ronald Kimmel, Fred R. Kimmel & Associates, Chicago, IL, for Plaintiff.

Charles W. Pautsch, Kerry E. Dwyer, Wessels & Pautsch, Milwaukee, WI, Renee LeGrand Powell, Wessels & Pautsch, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

This matter is before the Court on Defendant City of Aurora's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and motion to strike. For the reasons discussed hereafter, both motions are denied.

## I. BACKGROUND

Plaintiff Lisa Hillivi Brown, a black female, began employment with the Defendant City of Aurora's Police Department in April 1990. Prior to becoming a patrol officer, one must first attend a ten-week training course at a police academy. Upon completion of the police academy training course, the recruits are hired by the City of Aurora as probationary patrol officers. The recruits are not released from probation until they next successfully complete the "Officer Training Program (OTP)."

Generally, a recruit can earn a first release from the OTP after three months of training, and a second and final release after the fourth month of training. It is not unusual, however, for a recruit to spend an extra month in the OTP—many do, especially if one is not familiar with the Aurora area. But, if the recruit fails to earn a first and second release, his employment with the City of Aurora will be terminated.

While participating in the OTP, the recruits are assigned a "Field Training Officer (FTO)." FTOs train the recruits and are responsible for completing daily observation reports on each recruit. Generally, the recruits are assigned a new FTO on a monthly basis, but it is not unusual for a recruit to be assigned the same FTO twice.

Brown failed to earn a first release within her first three months in the OTP. Her FTOs concluded that her performance was lacking in the "streets and orientation," "self-initiated field activity," and "report writing" areas. Consequently, Brown's stay in the OTP was extended by one month on two separate occasions. After six months in the OTP, Brown had yet to earn her first release. Brown was therefore terminated.

On February 7, 1991, Brown filed a charge of race and sex discrimination with the Illinois Department of Human Rights (IDHR) and the Equal Employment Opportunity Commission (EEOC). On January 23, 1995, the EEOC issued a right to sue letter.

On April 19, 1995, Brown filed a complaint in this Court alleging violations of Title VII, 42 U.S.C. § 2000e et seq.; the complaint was subsequently amended twice. The complaint contains one count of race discrimination and one count of sex discrimination.

## II. DISCUSSION

Relying on Brown's brief, in her attempt to impose Title VII liability upon the City of Aurora, she advances one disparate treatment claim premised on two forms of dis-

crimination—race and sex.[1] Specifically, Brown claims that she was terminated from the City of Aurora's Police Department because of her race and/or sex. Following a statement of the summary judgment standard of review, the Court will address Brown's disparate treatment claim. The City of Aurora's motion to strike will be addressed while discussing the disparate treatment claim.

### A. Summary Judgment—Standard of Review

Under FED.R.CIV.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987).

### B. Title VII—Disparate Treatment

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race and/or sex. 42 U.S.C. § 2000e–2(a)(1). Brown admittedly offers no direct evidence that race or sex played a role in the City of Aurora's decision to terminate her,[2] thus, her disparate treatment claim will be analyzed under the three-step model enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, Brown must establish a *prima facie* case. She must show: (1) that she belongs to a protected group; (2) that she performed satisfactorily; (3) that she was subjected to an adverse employment action; and (4) that similarly situated employees outside the classification received more favorable treatment. *Hughes v. Brown*, 20 F.3d 745, 746 (7th Cir.1994).

Once established, the *"prima facie* case creates a rebuttable presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its allegedly biased employment decision." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir.1996). "If the employer meets its burden of production, the presumption dissolves." *Id.*

If the presumption dissolves, "[t]o prevail, the employee then must demonstrate that the nondiscriminatory explanation of the employer is pretextual." *Id.* Pretext means a lie. *Id.* There are three ways to show that a proffered nondiscriminatory explanation is pretextual: (1) the employer's explanation had no basis in fact; (2) the explanation was not the "real" reason; or (3) the reason

---

1. As will be discussed, Brown also claims that she received inadequate training in the "streets and orientation" area of the OTP. Brown, surprisingly, does not argue that the inadequate training qualifies as a separate incident of disparate treatment, such that it should be analyzed separately under the *McDonnell Douglas* test. Instead, Brown is content with discussing the inadequate training issue in the context of the City of Aurora's decision to terminate her.

2. As will be discussed, Brown's affidavit attests to the fact that racial and sexist comments were directed at her. She, however, makes no argument that the comments qualify as direct evidence of race or sex discrimination with respect to the City of Aurora's termination decision. *See Fuka v. Thomson Consumer Elec.*, 82 F.3d 1397, 1403 (7th Cir.1996) (To qualify as direct evidence of discrimination, "the plaintiff must show that the remarks 'were related to the employment decision in question.' ").

stated was insufficient to warrant the adverse employment action. *Id.* "In trying to establish that an employer's explanation is pretextual, an employee must 'focus on the specific reasons advanced by the defendant[s].'" *Id.*

### 1. *The Prima Facie Case*

■ The Court concludes that Brown has established a *prima facie* case of race and sex discrimination. Brown is a black female, she obviously belongs to a protected group (actually, two protected groups)—the first element is not disputed.

Regarding the second element, Brown's affidavit attests to the fact that in her opinion she was qualified to earn her first and second releases from the OTP following her six-month stay in the program. Although the City of Aurora disputes the adequacy of her performance, such a statement from Brown is sufficient to satisfy the second element of her *prima facie* case. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1114 n. 34 (7th Cir. 1992); *Williams v. Williams Elec., Inc.*, 856 F.2d 920, 923 n. 6 (7th Cir.1988).

■ The City of Aurora argues that the Court should strike the portion of Brown's affidavit attesting to her personal belief in the quality of her performance. The City of Aurora contends that Brown's affidavit is inconsistent with her prior deposition testimony. If Brown's affidavit was in fact inconsistent with her deposition testimony, the Court would agree with the City of Aurora's position and strike the pertinent paragraph of the affidavit. *See Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170–72 (7th Cir.1996); *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded. . . .").

The Court, however, does not believe that Brown's affidavit conflicts with her prior deposition testimony. In support of its position, the City of Aurora first cites Brown's

testimony where she conceded that she lacked the "tools" necessary to obtain her first release. Brown Dep. pg. 187. It appears to the Court, however, that Brown's concession concerned her performance in the early part of her six-month stay in the OTP, *i.e.*, Brown conceded that she lacked the necessary tools to obtain her first release after three or four months in the program.[3] But, the Court has not been cited to any deposition testimony where Brown conceded that she was not qualified to obtain her first release after six months in the program—and, that is the pertinent statement contained within the affidavit. Indeed, the closest testimony the Court could locate provides that Brown believes that she is qualified to be a City of Aurora officer. Brown Dep. pg. 206. Thus, the first cite to Brown's deposition testimony does not support the City of Aurora's position.

Next, the City of Aurora contends that Brown's concession that she needed additional remedial training while in the OTP (thus, implying that she was not performing up to par), Brown Dep. pg. 178, conflicts with her affidavit statement that her performance was sufficient to obtain her first and second release. Once again, though, the context in which Brown made the concession is unclear. It appears to the Court that Brown merely conceded that she needed the remedial training at the time it was given. But, there is no indication that Brown conceded the need for remedial training at the end of her sixth month in the OTP.

Finally, the City of Aurora claims that Brown's concession that she still requires one month of additional training before being qualified to be a police officer provides further evidence that she was not qualified to obtain her first or second releases and thus is inconsistent with her affidavit. The City of Aurora's position, however, ignores the context of Brown's concession. Indeed, the reason Brown stated that she needed a month of additional training is not because

---

**3.** The deposition questions were not specific enough for the Court to conclusively determine the time period at issue. And, the City of Aurora conveniently omits the surrounding pages, thus, the Court cannot conclusively determine the proper context of the question. Because this matter is before the Court on summary judgment, the Court gives Brown the benefit of the doubt.

she was unqualified after her time in the OTP, but because she has not been in the Aurora area "in years" and thus, would need the additional time to reacquaint herself with the streets.

Accordingly, the Court does not find that Brown's affidavit is inconsistent with her deposition testimony. In summary, the context in which most of the pertinent deposition testimony was provided is simply unclear. And, because this matter is before the Court on summary judgment, the Court will give Brown the benefit of the doubt. Thus, the City of Aurora's motion to strike the pertinent portion of Brown's affidavit is without merit.

Now, back to the *McDonnell Douglas* test and Brown's *prima facie* case.

Regarding the third element, Brown was terminated and thus subjected to an adverse employment decision—the third element is not in dispute.

The fourth element—whether similarly situated recruits outside of the classification received more favorable treatment—is a little more interesting. Because of the somewhat unique circumstances surrounding the employment decision, the Court believes that Brown has logically satisfied this element.

That is, as discussed, to become a City of Aurora police officer, a recruit must earn a first and second release from the OTP. Brown was the only female in the program—and, thus, the only black female.[4] Brown claims that she performed well enough to earn her first and second releases but was terminated instead of officially becoming a City of Aurora police officer. There were obviously other recruits in the program. Be-

cause the other recruits passed[5] the OTP and Brown failed, but Brown (according to her affidavit) performed well enough to pass, the other recruits logically received more favorable treatment. In other words, because Brown performed well enough to earn her first and second releases, but did not, while the other recruits did, she was singled out. The fourth and final element of Brown's *prima facie* case has been established.

### 2. The Legitimate, Nondiscriminatory Reason

The City of Aurora must now offer a legitimate, nondiscriminatory reason for its decision to terminate Brown. The City of Aurora does just that: it claims that it terminated Brown due to her poor performance in the OTP. In support of its position that Brown was not qualified to be a police officer, the City of Aurora submits the affidavits of two of Brown's FTOs during the OTP—Officer Mike Curran and Officer Greg Thomas. Curran was Brown's FTO during her first month and Thomas was her FTO during her third and fifth months of the OTP. Both officers state that Brown performed inadequately in the "streets and orientation," "self-initiated field activity," and "report writing" areas.

### 3. Pretext

■ Brown must now show that the City of Aurora's explanation for her termination is pretextual, *i.e.,* a lie. The only evidence Brown offers in support of her position that the City of Aurora is lying is her affidavit attesting to the fact that she was subjected to racist and sexist comments from some of her FTOs[6]—primarily, FTO Curran.[7] For

---

4. The parties have not informed the Court of the number of black males, there was at least one.

5. The Court has not been provided with information that any recruit other then Brown failed the OTP. Thus, the Court presumes that every recruit but Brown earned his first and second releases.

6. Additionally, Brown advances an argument that the Court should be skeptical of the City of Aurora's explanation because the city made three inconsistent statements. In summary, the alleged inconsistent statement regarding FTO Hamlin is the result of Brown's very own deposi-

tion testimony, Brown Dep. pg. 171; the statement regarding FTO Thomas is incomplete; and, even assuming the statement regarding FTO Dabney is accurate—although, it to is incomplete and thus misleading—its relevance is so negligible that it would add nothing to the Court's inquiry of whether Brown has come forward with enough evidence to support her position that the city's explanation is pretextual.

7. The City of Aurora asks the Court to strike the portion of Brown's affidavit which lists the statements of the FTOs on the grounds that such statements are hearsay. The city cites no authority in support of its assertion. The statements

example, FTO Curran: referred to Brown as "Missy, Missy;" would ridicule her shoe laces because they were very feminine (whatever that means); would comment about her ponytail; would comment about her petite size; told Brown that she "should be at home taking care of her daughter;" told her that she would probably make sergeant before him because she was female and black; after reading a headline in a local newspaper that read "Marquette Park Integrating," said that he was "glad that he no longer lived there and he felt sorry for his friends that still lived there;" after seeing an interracial couple, stated that "that would never happen in my neighborhood." FTO Thomas also commented about Brown's petite size and told Brown that he was not going to give "you people" anything. Brown interpreted the term "you people" as a reference to her race. *See Grady v. Illinois Bell Tel. Co.*, No. 94 C 3115, WL 473657 *8 (N.D.Ill. Aug. 13, 1996) (For the purposes of summary judgment, the court accepts that the defendant's alleged "you people" comment "was a reference to Plaintiff's race."). Finally, FTO Dabney told Brown that "all black kids come from broken homes." [8]

The statements collectively evidence—for the purposes of summary judgment—proof

of racist and sexist animosity directed toward black individuals and women.[9] The problem, however, is whether evidence of such remarks, *by itself,* is enough to create the inference that the City of Aurora's explanation for terminating Brown—a black woman—is a lie. The reason that there is a problem is because the Seventh Circuit has not been entirely clear, and arguably inconsistent, regarding the relevance of such evidence in the context of the plaintiff's attempt to create the inference that the employer's explanation is pretextual, *i.e.,* the final step under the indirect method of proof.

A couple of recent cases suggest that discriminatory remarks, *by themselves,* are *not* enough to support the inference that the employer's decision was premised on illegal discrimination; rather, the remarks can support such an inference *only* if considered in *conjunction* with *other* evidence.[10] *See Fuka v. Thomson Consumer Elec.,* 82 F.3d 1397, 1406 (7th Cir.1996) ("[T]hose statements, *when considered in conjunction with other evidence,* could support an inference of discrimination under the indirect, burden-shifting method.") (emphasis added); *Futrell v. J.I. Case,* 38 F.3d 342, 346 (7th Cir.1994)

---

are not hearsay. They are not being offered to prove the truth of the matter asserted. Rather, they are being offered to show the racial attitudes of the speakers. *See Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1423 (7th Cir.1986) (The statement "was not used to prove the truth of such utterances ... but to show what Lambert's racial attitudes were; hence it was direct evidence."); *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1249 (6th Cir.1995) ("The disparaging and racist comments allegedly made by Mr. DiRaimo and Mr. Pitino were not offered to prove the truth of the statements but to demonstrate the racial attitudes of Mr. DiRaimo and Mr. Pitino. Accordingly, the statements are not hearsay."). Even if they qualify as hearsay, the statements are admissible under FED.R.EVID. 803(3). *Talley,* 61 F.3d at 1249–50.

8. The City of Aurora attempts to lessen the significance of the statements by noting that many of the statements are race and/or sex neutral; thus, they certainly do not evidence racist or sexist animus on the part of the FTOs. As noted recently by the Third Circuit, however, the antidiscrimination laws have "educated" numerous violators. *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1081 (3rd Cir.1996). Thus, rarely do would-be violators openly use derogatory epi-

thets. *Id.* Indeed, discrimination is much more subtle these days and is frequently cloaked with the appearance of propriety. *Id. at* 1082. Because the FTOs made comments which clearly evidence racist and sexist attitudes, the Court is not moved by the city's contention that comments which facially appear to be race and/or sex neutral were in no way motivated by discriminatory animus.

9. Brown brings no claim that she was subjected to a hostile working environment as a result of the race and/or sex-based comments.

10. It is important to recognize a distinction here. Brown is attempting to establish discrimination by utilizing the *McDonnell Douglas* indirect evidence method of proof. Brown is not relying on the direct evidence method of establishing discrimination. If Brown was relying on the direct method, she would have to link the discriminatory remarks to the employment decision, a very difficult task. *See Fuka v. Thomson Consumer Elec.,* 82 F.3d 1397, 1403 (7th Cir.1996). Because, however, Brown is relying on the indirect method, the remarks need not be linked to the employment decision. *See Futrell v. J.I. Case,* 38 F.3d 342, 347 (7th Cir.1994).

("While no *one* of these factors alone might sustain an age discrimination claim, their *sum* does permit a reasonable inference of discrimination.") (emphasis added); *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 662 (7th Cir.1993) ("[T]hose remarks *standing alone* were insufficient as a matter of law to support an inference of age discrimination.") (emphasis added).

At least one case has held that statements evidencing discriminatory animus, "when unrelated to the decisional process," are simply "insufficient to demonstrate that the employer relied on illegitimate criteria, even when uttered by a decision maker." *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1266 (7th Cir.1993); *see Knox v. First Nat'l Bank of Chicago*, 909 F.Supp. 569, 572–74 (N.D.Ill. 1995) (discussing contradictory Seventh Circuit case law and *Hong* decision).

Still, other cases seem to look to the totality of the circumstances—such as the type and frequency of the remark, the context in which the remark was stated, the period of time between the remark and the adverse employment action, and whether the remark was uttered by the decision maker—and ask whether such circumstances could create a reasonable inference that the employer's legitimate nondiscriminatory explanation is pretextual. *See, e.g., Weisbrot v. Medical College of Wis.*, 79 F.3d 677, 684–85 (7th Cir.1996); *Hill v. Burrell Communications Group, Inc.*, 67 F.3d 665, 669 (7th Cir.1995); *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1116 (7th Cir.1992) (discussing *McCarthy v. Kemper Life Ins. Co.*, 924 F.2d 683 (7th Cir.1991)); *McCarthy*, 924 F.2d at 687 n. 4; *see also, Knox*, 909 F.Supp. at 574 (focusing on the "probative value" of the remark).

So what is the Court to do?

■ The Court does not believe that there can be a bright-line rule as to whether discriminatory remarks, by themselves, are sufficient to raise a reasonable inference that the employer's legitimate, nondiscriminatory reason is pretextual. Rather, each case must be analyzed on its own facts. The inquiry should focus on the type and frequency of the remark, the context in which the remark was stated, the period of time between the remark and the adverse employment action, whether the remark was uttered by the decision maker, and any other relevant factors. As discussed below, based on the circumstances surrounding Brown's termination, the Court finds that one could reasonably infer that the City of Aurora's explanation is a lie; thus, the factfinder should determine the truthfulness of the explanation.

First, the racist and sexist remarks were made by three of the decision makers, *i.e.*, by individuals who had Brown's fate in their hands. Importantly—and surprisingly—neither party has informed the Court of the identity of the ultimate decision maker. Thus, the Court will presume that each of Brown's FTOs had *significant* input in determining whether she would pass or fail the OTP.[11]

As noted, the vast majority of the racist and sexist remarks were made by FTO Curran. Some of his remarks could be viewed as being "related" to the decision to terminate Brown. For instance, he told her that she should be at home taking care of her child and that she would make sergeant before him because she was black and female. Such comments certainly evidence animosity toward working women (and, with respect to the latter comment, a black woman). Furthermore, Brown testified that Curran made derogatory comments on a daily basis while he was her FTO—Curran was Brown's FTO during only the first month of her six-month stay in the OTP. FTO Dabney made only

---

11. On the final page of the City of Aurora's reply brief, it attempts to downplay FTO Curran's numerous sexist and racist remarks by noting that he was her FTO for only her first month in the OTP and thus, he "was not in a position to decide on her first or second releases or to terminate her employment." The city, however, cites no evidence that Curran lacked the authority to determine Brown's fate in the OTP. Moreover, the city's factual assertion regarding Curran's lack of authority is also noticeably missing from its Local General Rule 12(M)(3) statement of undisputed material facts. Thus, the Court will not accept the City of Aurora's unsupported factual assertion.

one racist comment and FTO Thomas, who was Brown's FTO during her third and fifth months, made the "you people" comment and commented about Brown's petite size.[12]

Finally, the termination decision arose in the context of a recruit training program. The Court finds the relatively short-term nature of Brown's employment history (in the OTP) with the City of Aurora significant. In contrast to most Title VII termination cases, Brown never had the opportunity to have her performance judged over an extended period or by several different superiors. Instead, the only thing the Court knows about Brown's performance is what the FTOs attest to regarding her time in the OTP. Thus, since no one else was knowledgeable about Brown's ability, the FTOs had a considerable amount of power over Brown's continued employment with the City of Aurora. And, as discussed, three of the FTOs harbored racist and/or sexist views.

Moreover, the recruits' performance was being monitored and evaluated on a daily basis in the OTP. Each day the assigned FTO filled out an observation report on his recruits. Every day was therefore important. Thus, particularly with regard to Curran, the racist and sexist remarks were essentially made contemporaneously with the FTOs' evaluation of Brown.

In summary, the Court concludes that the circumstances of this case are such that one could reasonably infer that the City of Aurora is lying as to why it terminated Brown. The totality of the circumstances—numerous remarks evidencing racist and sexist views, such remarks made while Brown was being evaluated, a short-term recruit training program, and remarks made by FTOs who had significant input regarding Brown's fate—convince the Court that the factfinder should decide whether Brown's termination was motivated by her poor performance or by racist and/or sexist attitudes on the part of the decision makers.

12. The Court does not know during what month of Brown's stay in the OTP Dabney was her FTO or the frequency of Thomas' comments regarding Brown's petite size.

### III. CONCLUSION

Based on the foregoing analysis, the City of Aurora's motion for summary judgment and motion to strike are denied.