Barbara J. HAWTHORNE, Plaintiff,

v.

ST. JOSEPH'S CARONDELET CHILD CENTER, Defendant.

No. 96 C 2356.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 30, 1997.

William B. Thompson, Wheaton, IL, for Barbara J. Hawthorne.

James W. Gladden, Jr., Kim Ann Leffert, Barry A. White, Shannon Michelle Moritz, Mayer, Brown & Platt, Chicago, IL, for St. Joseph's Carondelet Child Center.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Barbara Hawthorne ("Hawthorne") has charged her former employer St. Joseph's Carondelet Child Care Center ("St. Joseph's") with employment discrimination, alleging that she was subjected to sexual harassment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII," 42 U.S.C. §§ 2000e to 2000e-17). Hawthorne also asserts an Illinois state law breach of contract claim against St. Joseph's.

St. Joseph's has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. Both sides have complied with this District Court's General Rule ("GR") 12(M) and 12(N),[1] which has been adopted to highlight the existence or nonexistence of any material fact disputes, and the motion is fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, St. Joseph's motion is denied in principal part and granted to a lesser extent.

### Summary Judgment Standards

Familiar Rule 56 principles impose on St. Joseph's the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.,* 116 F.3d 262, 265 n. 2 (7th Cir.1997)). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broad. Co.,* 957 F.2d 368, 370–71 (7th Cir.1992), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County,* 969 F.2d 250, 254 (7th Cir.1992)). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Hawthorne was treated in a statutorily discriminatory fashion (*Fuka v. Thomson Consumer Elec.,* 82 F.3d 1397, 1402 (7th Cir.1996)) and cases cited there).

### Facts [2]

St. Joseph's hired Hawthorne in April 1990 to work as a counselor at its residential treatment center, which provides care and education for 30 emotionally disturbed boys (S. 12(M) ¶¶ 1–2). Hawthorne was assigned to Krause Hall, which houses boys from the ages of 11 to 14 (*id.* ¶¶ 5–6). She was direct-

---

1. This opinion refers to St. Joseph's GR 12(M) statements as "S. 12(M) ¶ —" and to Hawthorne's additionally numbered GR 12(N) statements as "H. Supp. 12(N) ¶ —." Unless otherwise noted, the cited statements have either been explicitly or implicitly admitted in the corresponding response. Those same "S." and "H." abbreviations will be employed for the parties' other filings.

2. As with every summary judgment motion, this Court accepts nonmovant Hawthorne's version of the facts that have been culled from the parties' submissions, with any differences between them resolved in Hawthorne's favor.

ly supervised by Krause Hall's unit supervisor, a position that was filled by Tyrone Tillman ("Tillman") from June 14, 1993 until the termination of Hawthorne's employment (*id.* ¶¶ 6–7).

In May 1993, when Tillman was a counselor in another hall and not yet Hawthorne's supervisor, he approached Hawthorne and expressed a desire to tell her about a "really crazy and wild dream" in which she had been the subject (H. Supp. 12(N) ¶ 18;[3] Hawthorne Dep. 130–31). In May or June Tillman called Hawthorne and again asked her out to discuss the dream and to see his collection of movies (*id.* ¶¶ 20, 22). And in late May Tillman approached Hawthorne at work, again asking for a date to discuss the dream and also telling Hawthorne that she was prettier than his wife and that his marriage was boring, and rating Hawthorne physically in comparison with a coworker (*id.* ¶ 24). In response to each of those incidents Hawthorne told Tillman that she was not interested in his dream or in getting together with him (*id.* ¶ 20; Hawthorne Dep. 131, 137, 139–40).

Sometime in May Hawthorne complained to Delores Wilks ("Wilks"), a supervisor in another hall, about Tillman's behavior (H. Supp. 12(N) ¶ 52). Wilks told Hawthorne not to do anything about Tillman's conduct—to "ignore" Tillman, and the problem would go away (*id.* ¶ 53). Then in July 1993 Wilks resigned from St. Joseph's, and Hawthorne did not thereafter raise the matter with any St. Joseph's employee (other than asserting her resistance to Tillman himself, of course).

After Tillman was appointed Hawthorne's supervisor in June 1993, the problem did not go away at all—indeed, he again asked her out. After a staff meeting in August 1993—when "throughout the whole meeting Tyrone continued to sort of eyeball me and to make me feel very uncomfortable" (Hawthorne Dep. 170)—Tillman told Hawthorne that she looked "hot" and asked for a date, pursuing her down a hall and out the door and asking

where she was going "looking so pretty" (*id.* at 170–72). Hawthorne ignored his request for a date and attempted to leave the scene to escape what she described as a "very uncomfortable" and "totally unprofessional" situation (*id.*).

After she had turned down Tillman's requests, Hawthorne says that although he did not directly threaten to fire her, "from his hostile behavior, he just let me know he's in control here" (*id.* at 194). She refers to the following incidents as examples:

1. Staff meetings were scheduled on her days off in July, but when she then attended she found that the meetings had been cancelled and only Tillman would be present (*id.* at 142).

2. She was assigned to work alone for a few shifts between June 1993 and her termination in January 1994, even though female employees were not normally assigned solo duty (*id.* at 144–56).

3. Between September and December 1993 she was not scheduled for the full 40 hours that she usually received (*id.* at 197).

4. Although she had previously attended most camp outings with the residents, she was not allowed to attend camp two out of three times once Tillman became her supervisor—thus missing an opportunity to work a greater number of hours over a short period (H. Supp. 12(N) ¶ 42; Hawthorne Dep. 166).

5. On an unknown date she had a confrontation with Tillman over whether she had used proper channels to request reimbursement for a receipt. Tillman chastised her for going over his head and said. (Hawthorne Dep. 158–61):

> It appears you don't like me. And everything that happens on the dorm, it comes through me. You can say I'm like god, you know.

6. In September 1993 several St. Joseph residents became upset and were throwing chairs, and Hawthorne left the scene to switch with another counselor in a

---

**3.** St. Joseph's response to that GR Supp. 12(N) statement—a response repeated throughout St. Joseph's 12(M) reply—says that St. Joseph objects that the statement is "not material." That legal objection does not establish a factual dis-

pute under GR 12(N)'s requirements, however, and is therefore deemed an admission (see, e.g., *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 453 (7th Cir.1994)).

different hall. After that incident she received an oral warning from Tillman (S. 12(M) ¶ 17), a warning that she claims was unwarranted.

Hawthorne also contends that her eventual termination was the result of Tillman's hostility towards her. Hawthorne was fired after a January 1994 incident in which a resident whom she was counseling was physically restrained by another counselor and had two teeth knocked out as a result (S. 12(M) ¶¶ 21–25). Following the incident St. Joseph's conducted an investigation in which Tillman participated, at least to the extent of interviewing Hawthorne about the incident and consulting with other management personnel in making the decision whether Hawthorne should be terminated (*id.* ¶¶ 30, 33; Hawthorne Dep. 118). On January 13, 1994 Hawthorne was terminated, in a letter signed by Tillman, for what was characterized as Hawthorne's failure to provide support to the resident and her co-worker during that altercation (S. Dep. Ex. 5).

On June 7, 1994 Hawthorne filed a sexual harassment charge with the EEOC (S. Dep. Ex. 9). On January 31, 1996 she received her right-to-sue letter, and she timely filed this federal complaint on April 22, 1996.

### Count I—Sexual Harassment

■ Title VII's prohibition against sex discrimination includes a ban on sexual harassment (*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–23, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993)). Sex discrimination of that type occurs either (1) where specific benefits of employment are conditioned on sexual demands ("quid pro quo theory") (*Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986); *Bryson v. Chicago State Univ.,* 96 F.3d 912, 915 (7th Cir.1996)) or (2) where an employer's conduct creates a work environment that is hostile or abusive to women ("hostile work environment theory") (*Harris,* 510 U.S. at 21, 114 S.Ct. at 370). Because Hawthorne has invoked both theories in

Complaint ¶¶ 24 and 25 and in H. Mem. 3, this opinion addresses each in turn.

### Quid Pro Quo Theory

In substantive terms *Bryson,* 96 F.3d at 915 quoted the EEOC Guidelines on Sexual Harassment, 29 C.F.R. § 1604.11(a) (alteration in original), to describe quid pro quo harassment:[4]

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment [or] submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

*Bryson, id.* further observed that a five-factor test used by many Courts of Appeals was a useful framework with which to determine whether a plaintiff had proved such a claim.

■ Although *Bryson* did not explicitly adopt that test, this opinion will echo our Court of Appeals' employment of that "useful framework" (especially given its clear utility under the circumstances of this case) in assessing Hawthorne's quid pro quo claim. As described in *Bryson, id.,* the five-part test asks whether the plaintiff has shown:

> (1) that she or he is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of her employment, and (5) respondeat superior has been established.

In the summary judgment context, then, Hawthorne can survive St. Joseph's motion if she can establish at least a genuine issue of material fact as to each of those elements.

■ There is no real question as to the first three elements in the *Bryson* formulation. As for the first two, Hawthorne is a member of a protected class, and she has

---

4. St. Joseph's urges this Court to assess the merits of Hawthorne's quid pro quo claim by using the familiar *McDonnell–Douglas* burden-shifting approach. While Hawthorne has gamely responded along those lines, the standards identified in *Bryson* are better suited to resolving this motion.

certainly proffered enough evidence that she found Tillman's overtures unwelcome. And in terms of the third factor of sexual motivation, Tillman made three requests for dates with Hawthorne to discuss the "really crazy and wild" dream he had about her. In summary, the substance, context, and repetition of Tillman's requests for dates and his comments about his "really crazy and wild" dream, about his dissatisfaction with his wife and about Hawthorne's physical appearance adequately satisfy the requirement that Tillman made an unwelcome sexual advance.[5]

To skip to the final *Bryson* factor, Hawthorne can also link Tillman's actions to St. Joseph's. No matter what the state of the law had been earlier, a majority of the judges of our Court of Appeals have now held in *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 495 (7th Cir.1997) (per curiam) that "liability for quid pro quo harassment is strict even if the supervisor's threat does not result in a company act." It is thus enough that Tillman made a sexual advance while he was Hawthorne's supervisor at St. Joseph's and that all of his retaliatory adverse employment actions also took place while he was Hawthorne's supervisor. Because a more demanding negligence standard for quid pro quo claims represents a minority view within our Court of Appeals, it is immaterial whether St. Joseph's management knew or could have known about Tillman's conduct in this regard.[6]

Hence *Bryson*'s fourth factor is the pivotal element on this summary judgment motion. For that purpose Hawthorne must show[7] that a "tangible aspect of employment benefit was affected" and that such effect was a result of her refusal to submit to Tillman's demands (*Bryson*, 96 F.3d at 916). Those two parts will be addressed in turn.

Hawthorne has shown, at least in the sense needed to avert summary judgment, that she was denied a tangible employment benefit. *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996) teaches that a variety of materially adverse employment actions, including termination or a reduction in benefits or pay, will meet that requirement. Here Hawthorne has presented evidence that she was both fired and suffered reductions in pay and benefits as a result of Tillman's hostility towards her after she rejected his advances. St. Joseph's cannot deny that Hawthorne was fired, and it has not refuted Hawthorne's charges that she suffered other job-related sanctions after Tillman became her supervisor. Those included (1) economic penalties such as the reduction in scheduled working hours and the lost opportunity to work on the lucrative camping trips and (2) non-economic penalties such as being forced to work alone, not being notified that staff meetings scheduled on her day off were canceled, and being given an unwarranted disciplinary warning. These pre-termination sanctions were additional material job detriments ascribable to Tillman's actions.

That however does not complete the inquiry into *Bryson*'s fourth factor, for Hawthorne must also show that Tillman denied her those employment benefits because she rejected his advances (*Bryson*, 96 F.3d at 916). In that respect Hawthorne's evidence of causation is largely circumstantial, but it suffices to offer a genuine issue of fact.

As the most direct evidence of causation, it will be recalled that Tillman confronted Hawthorne over a disputed reimbursement check and declared:

> It appears you don't like me. And everything that happens on the dorm, it comes

**5.** St. Joseph's argues that the applicable 300–day limitation period for EEOC complaints could act to bar consideration of incidents that took place after August 11, 1993. As discussed below in reference to Hawthorne's hostile workplace claim, that position is untenable as an evidentiary matter (and perhaps on a "continuing violation" theory as well).

**6.** Because the parties' briefing of St. Joseph's motion antedated the promulgation of the magnum opus in *Jansen*, all of their discussion on the

issue of knowledge or constructive knowledge is now beside the mark.

**7.** As always, this opinion uses "show" and "prove" both to avoid the awkward repetition of language expressing the lesser need to adduce evidence that creates a genuine issue of material fact and to echo the language of the cases as to what a successful plaintiff must prove. In fact this Court has properly applied the lesser burden to Hawthorne's required showing.

through me. You can say I'm like god, you know.

In light of Tillman's general treatment of Hawthorne, a trier of fact could reasonably find that statement to be a veiled threat. In addition, there is evidence that Tillman singled out Hawthorne from other St. Joseph's employees for poor treatment. Hawthorne was the only female employee who had to work alone (something that had never happened to her before Tillman became her supervisor) and was apparently the only employee not notified when staff meetings were canceled. Finally, the reduction in Hawthorne's work hours and opportunities to go on camping trips after Tillman became her supervisor is another issue that could impress a trier of fact as causally related to her rejection of his sexual advances. Thus the evidence is enough to defeat St. Joseph's motion for summary judgment.

St. Joseph's has attacked Hawthorne's causation showing by denying that Tillman had the ability to get Hawthorne fired because only St. Joseph's senior management had the power to fire employees.[8] But it is undisputed that Tillman, as Hawthorne's direct supervisor, "was consulted prior to her termination [and] was responsible for signing the notice of termination" (Tomlinson Aff. ¶ 8). That raises a genuine issue of fact as to Tillman's role and influence in the termination process (as to whether he could and did poison the decisional well). Further, to repeat the point made in n. 8, St. Joseph's has not challenged the causation evidence supporting Hawthorne's claim of the other job-related sanctions. Because those sanctions, if motivated by Tillman's desire for revenge, suffice to show that Hawthorne suffered tangible employment detriments, St. Joseph's implied admission also leaves an issue of material fact.

In sum, all five *Bryson* factors have been shown to exist (in the summary judgment sense, see n. 7). Accordingly St. Joseph's summary judgment motion on Hawthorne's quid pro quo claim is denied.

*Hostile Environment Theory*

■ Title VII also prohibits discriminatory conduct that has "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment" (*Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir.1994), quoting *Meritor*, 477 U.S. at 64–65, 106 S.Ct. at 2404–05). Hawthorne argues that the evidence of Tillman's comments, his requests for dates and his imposition of work-related punishments (because Hawthorne rejected his advances) presents issues of material fact sufficient to survive a summary judgment motion on her hostile workplace claim. While substantially the same evidence formed the basis for Hawthorne's quid pro quo claim, they are two distinct theories of liability that must be addressed separately.

■ As a threshold matter St. Joseph's argues that much of the evidence that Hawthorne cites as evidence of a hostile working environment cannot be considered because of the statute of limitations for EEOC complaints. Illinois, as a deferral state, gives a plaintiff 300 days from a discriminatory act to file a charge (*Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 707 (7th Cir.1995)). St. Joseph's contends that because Hawthorne did not file her EEOC charge until June 7, 1994, this Court should give no consideration to any acts of asserted discrimination that preceded August 11, 1993. If credited, that argument would exclude all but one of the incidents in which Tillman described his dream to Hawthorne or asked her out.

But at its best that position misses the critical distinction between (1) the admissibility into evidence and (2) the actionability under Title VII of conduct that antedates the

---

**8.** St. Joseph's has, in the course of its *McDonnell–Douglas* burden-shifting argument, insisted that Hawthorne's negligent conduct in two incidents provided it with a legitimate reason to fire Hawthorne, so that Hawthorne must show the pretextual nature of the reasons that St. Joseph's asserts. As noted earlier, the *Bryson* framework is better suited to analyzing this and it does not require this Court to make any such factual judgments about the employer's motive. Moreover, St. Joseph's has not provided any claimed nondiscriminatory explanation for the other adverse punitive job-related measures that Tillman inflicted upon Hawthorne, so its motion for summary judgment would not succeed in any event.

300–day period. Even apart from a possible application of the "continuing violation" theory to bring Tillman's earlier sexual advances into play as a substantive claim (see, e.g., *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1166–67 (7th Cir. 1996)), the very notion of a hostile environment is necessarily cumulative in nature. So Tillman's pre–August 11, 1993 conduct is in evidence in all events, and it could fairly be viewed by the trier of fact as part of the environmental matrix, sufficing at a minimum to create a genuine factual issue.

There is however another potential limiting factor on Hawthorne's hostile environment claim. *Jansen*, 123 F.3d at 494 has recently reaffirmed that employers are judged by a negligence standard, rather than strict liability, for employee harassment in that context. *Juarez v. Ameritech Mobile Communications Inc.*, 957 F.2d 317, 320 (7th Cir.1992), quoting *Brooms v. Regal Tube Co.*, 881 F.2d 412, 420 (7th Cir.1989), had earlier held (and *Jansen* confirms that it remains true) that an employer is liable for hostile work environment harassment only "if the employer knew or should have known about an employee's acts of harassment and fails to take appropriate remedial action." Hence St. Joseph's can be held liable on this second theory only to the extent that it knew or should have known about Tillman's harassment of Hawthorne.

■ Hawthorne's argument on that score rests solely on the basis of a complaint that she made to Delores Wilks, the unit supervisor for Ambrose Hall at St. Joseph's.[9] Hawthorne spoke to Wilks about Tillman's behavior in May 1993, although the record is unclear as to the details of the conversation or the exact date.[10] Wilks stopped working at St. Joseph's in July, and Hawthorne did not make any further complaints about Tillman to Wilks or any other St. Joseph's supervisor or executive.

There are potential problems with holding St. Joseph's responsible for knowing about Tillman's behavior based solely on that Hawthorne–Wilks conversation. *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir.1997) has recently dealt with the imputation to an employer of information about sexual harassment gained by an employee—and for that purpose *Young* held (following a recent Second Circuit decision):

> [T]he information must either (1) come to the attention of someone who (a) has under the terms of his employment, or (b) is reasonably believed to have, or (c) is reasonably charged by law with having, a duty to pass on the information to someone within the company who has the power to do something about it; or (2) come to the attention of such a someone.

While St. Joseph's employment manual clearly states that sexual harassment complaints should go to the Executive Director, the record is silent as to whether Wilks, as a unit supervisor, herself had the affirmative duty to pass on to the Executive Director sexual harassment complaints made known to her. On the present record it would seem reasonable to draw that inference in Hawthorne's favor. Moreover, it also seems a reasonable inference that a supervisor such as Wilks, who worked on a floor adjacent to Hawthorne's, would at least be in position to

---

9. Hawthorne does not make a plausible claim that any members of St. Joseph's senior management witnessed or otherwise had direct knowledge of Tillman's activities. Nor does she argue (an argument that this Court would reject in any event) that Tillman's knowledge of his own behavior should be imputed to the company because Tillman was a supervisor (importantly in that regard, he was not in the upper management echelon). Finally, while it is possible for sexual harassment to reach a level at which it can be presumed that a company must have been aware that a hostile working environment existed (*Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 447 (7th Cir.1994)), the record here will not support any such contention.

10. Hawthorne's deposition testimony is mixed. First she stated that she spoke with Wilks "the first of May the first time, after the incident about the dream" (Hawthorne Dep. 180). Later Hawthorne agreed with a question that suggested she had informed Wilks about "Tillman's several attempts to discuss the dream" (*id.* at 188). In the light most favorable to the non-moving party, it may be assumed that Hawthorne complained to Wilks about the first three times that Tillman asked Hawthorne out or spoke about the dream (the final incident occurred after Wilks no longer worked at St. Joseph's).

communicate Hawthorne's sexual harassment complaint to the Executive Director. Finally, it is equally plain that Hawthorne believed that Wilks was an appropriate authority figure to resolve the problem, and the reasonableness of that belief could be an issue for the trier of fact. So Hawthorne would appear to survive summary judgment under either 1(a) or 1(b) of the *Young* formulation—enough for a factfinder to render St. Joseph's responsible for knowing the information that Hawthorne gave to Wilks.

Once that threshold is crossed, St. Joseph's can also be held responsible for knowledge about the rest of Tillman's activities once he became Hawthorne's supervisor. Its knowledge or imputed knowledge of Tillman's earlier conduct carries with it the corollary that St. Joseph's had thereby been put on notice that, at least with regard to his working relationship with Hawthorne, Tillman was a loose cannon. Tillman was promoted on June 14, 1993, just a few weeks after Hawthorne's complaint to Wilks. Once St. Joseph's is found chargeable with knowledge of that complaint, it is surely a reasonable inference that it should have been watchful as to the prospect that Tillman would use his new-found position of authority to exact some revenge upon Hawthorne. It is consequently a reasonable inference that St. Joseph's should have known about all of Tillman's behavior, so that all of it must be considered when assessing Hawthorne's hostile environment claim.

That leads to the final step: assessing whether the evidence supporting Hawthorne's hostile environment claim is sufficiently severe to avoid dismissal as a matter of law. On that score *Harris*, 510 U.S. at 21–22, 114 S.Ct. at 370–71 teaches:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Because Hawthorne's testimony as to her dismay and discomfort with Tillman's behavior satisfies the subjective wing of the test, what remains is the question whether a reasonable person would objectively find the working atmosphere at St. Joseph's sufficiently hostile or abusive to support Hawthorne's claim. As *Harris, id.* at 23, 114 S.Ct. at 371 further instructs:

> We can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

St. Joseph's rightly says that hostile environment sexual harassment claims are not granted lightly in this Circuit. On occasion our Court of Appeals has aggressively applied the maxim that "non-severe misconduct will not support a hostile environment claim" to dismiss sexual harassment claims as a matter of law (see *Saxton v. AT&T Co.*, 10 F.3d 526, 533–35 (7th Cir.1993), upholding summary judgment against an employee where her supervisor made repeated physical advances toward her, including kissing her, rubbing her thigh and putting his hands above her knee; *Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 337 (7th Cir.1993), finding no actionable harassment where plaintiff's supervisor asked plaintiff out on dates, called her a "dumb blond," placed his hand on her shoulder several times, placed "I love you" signs in her work area and attempted to kiss her on one or more occasions). St. Joseph's contends with considerable force that Tillman's sexual advances alone pale in comparison to the facts of *Saxton* and *Weiss*.

But it does not follow that Hawthorne's claim must fail as a matter of law, for St. Joseph's argument is only partially apposite here. To be sure, while Tillman's comments and sexual advances were inappropriate and unprofessional, particularly the incident that took place while Hawthorne was Tillman's subordinate, they alone would be unlikely to sustain a hostile environment claim (see also *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428,

431 (7th Cir.1995), finding no hostile work environment where the alleged harasser never touched the plaintiff, invited her (either explicitly or by implication) to have sex or go on a date, threatened her, exposed himself, showed her dirty pictures or "said anything to her that could not be repeated on prime time television"). St. Joseph's problem is that its argument does not recognize Tillman's entire range of misbehavior—his sexual advances were only one facet of the asserted wrongdoing in this case. Instead the intolerable workplace environment complained of by Hawthorne was a combination of the overtly sexual comments and suggestions and the job-related indignities that Tillman visited on Hawthorne when she was nonresponsive to those comments and suggestions.

In that latter regard Tillman's offenses were numerous and continuous, beginning almost immediately after Tillman became Hawthorne's supervisor (when Tillman forced Hawthorne to come in on her days off for canceled meetings in July). As already explained, Tillman unreasonably interfered with Hawthorne's work performance by cutting her hours and opportunities to go on camping trips, by giving her unwarranted written reprimands and by forcing her to work alone. That last practice also exposed Hawthorne to physical danger, for she was left by herself watching over a hall filled with troubled youths.

When Tillman's workplace comments and sexual advances are coupled with those surrounding misdeeds, Hawthorne's claim cannot be dismissed at the summary judgment stage. Although St. Joseph's may be able to contradict or otherwise counter Hawthorne's version of events at trial, it cannot now be said as a matter of law that the cumulative impact of Hawthorne's version fails to meet the objective standard of requisite abuse. Accordingly, St. Joseph's motion for summary judgment on Hawthorne's hostile environment claim is also denied.

### Count II—Breach of Contract

Hawthorne also seeks to advance a breach of contract claim under Illinois state law. Hawthorne reads the St. Joseph's employee manual as forming a contract that requires an oral warning to any employee before she is terminated, and she claims that St. Joseph's did not fulfill that requirement when it fired her. That contention fails for the simple reason that the employee manual did not create any contract.

■■■ Despite Illinois' status as an employment-at-will state, there are limited circumstances under which an employee handbook may give rise to a binding contractual obligation (*Duldulao v. St.Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 482, 106 Ill.Dec. 8, 505 N.E.2d 314 (1987)). That exception to the rule applies only "if the traditional elements necessary for contract formation are present" (*id.* at 490, 106 Ill.Dec. at 12, 505 N.E.2d at 318). Disclaimers of any contractual intention are inconsistent with the traditional requirements of contract formation (*Doe v. First Nat'l Bank*, 865 F.2d 864, 873 (7th Cir.1989), holding as a matter of law that a document that clearly states that it is not meant to bind the parties cannot constitute a contract under *Duldulao*).

■■ St. Joseph's Personnel Manual § 1–5 is at least as clear as the document considered in the last-cited case:

> The manual establishes normal employment policies for all employees. The manual policies are not to be read narrowly as "terms of a contract" between you and the Center, but rather as guidelines which provide a frame work for day-to-day practices. The manual does not alter, amend or change in any way the status of all employees as employees, and just as all employees are free to end their employment whenever they choose, the Center enjoys the same right to terminate the employment relationship at any time. No Center employee or supervisor has the authority to alter, orally or in writing, the terminable at will status of any employee.

That explicit provision disclaims any intent on St. Joseph's part to contract with Hawthorne (or any other employee) via the employment manual, thus torpedoing Hawthorne's breach of contract argument.

Even if the manual could be read differently (as it cannot), Count II still would not

survive summary judgment because Hawthorne's proposed reading of its substantive language flies in the face of its actual words. Instead of requiring St. Joseph's to give an oral warning to any employee prior to discharge, the manual explicitly provides that "[d]ischarge may be based upon a single violation of the Center's policy" (S. Dep. Ex. 9 ¶ 4.5). Hawthorne's attempt to excerpt different snippets of the manual to argue that an oral warning is required before termination is simply disingenuous. St. Joseph's motion for summary judgment is granted as to Count II.

### Conclusion

St. Joseph's has not met its burden of establishing the lack of a genuine issue of material fact as to Hawthorne's Count I claims of quid pro quo or hostile environment sexual harassment. Its Rule 56 motion on those claims is therefore denied, and the claims must go to trial. But St. Joseph's has met its like burden as to Hawthorne's Count II breach of contract claim. That claim is dismissed. This action is set for a status hearing at 8:45 a.m. on November 5, 1997 to discuss what remains to bring Count I to trial.