**Kirsten HAINKE, Plaintiff,**

v.

**GLEESON, SKLAR, SAWYERS & CUMPATA LLP, et al., Defendants.**

**No. 98 C 6282.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 8, 1999.

Fred R. Kimmel & Associates, Chicago, IL, for Plaintiff Kirsten Hainke.

Michael S. Poulos, Sally J. McDonald and Kim Matsunaga of Rudnick & Wolfe, Chicago, IL, for Defendant Gleeson, Sklar,Sawyers & Cumpata LLP.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Kirsten Hainke ("Hainke") has sued her ex-employer Gleeson, Sklar, Sawyers & Cumpata LLP ("Gleeson"), claiming that Gleeson (1) violated the Americans with Disabilities Act ("ADA," 42 U.S.C. §§ 12101 to 12117[1]) by terminating her employment because of her various medical conditions, (2) violated Employee Retirement Income Security Act ("ERISA") § 510 (29 U.S.C. § 1140) by firing her to prevent her access to employee benefits, (3) violated Title VII of the Civil Rights of 1964 ("Title VII," 42 U.S.C. §§ 2000e to 2000e–17) by subjecting her to hostile work environment sexual harassment and (4) also violated Title VII by firing her in retaliation for protesting and reporting the sexual harassment.[2] Gleeson now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56.

Both sides have complied with this District Court's local rules that were General Rules 12(M) and 12(N) at the time of the parties' filings but that have respectively been redesignated as LR 56.1(a) and 56.1(b) effective September 1, 1999.[3] Glee-

---

**1.** Further ADA citations will take the form "Section—," using the Title 43 number rather than ADA's internal section numbering. Pertinent regulations from 29 C.F.R. are cited "Reg. § —."

**2.** This Court earlier granted defendants' oral motion to dismiss Hainke's claim of intentional infliction of emotional distress.

**3.** LR 56.1(a) and 56.1(b) are designed to facilitate the resolution of Rule 56 motions by requiring evidentiary statements and responses to such statements (in each instance with

son's Rule 56 motion is now fully briefed and ready for decision. For the reasons set out in this memorandum opinion and order, the motion is granted in full and this action is dismissed.

### Summary Judgment Standards

Familiar Rule 56 principles impose on Gleeson the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose this Court must "read[ ] the record in the light most favorable to the non-moving party," although it "is not required to draw unreasonable inferences from the evidence" (*St. Louis N. Joint Venture v. P & L Enters., Inc.,* 116 F.3d 262, 265 n. 2 (7th Cir.1997)). While "this general standard is applied with added rigor in employment discrimination cases, where intent is inevitably the central issue" (*McCoy v. WGN Continental Broad. Co.,* 957 F.2d 368, 370–71 (7th Cir.1992)), that does not negate the potential for summary judgment in cases where a movant plainly satisfies the Rule 56 standards (*Washington v. Lake County,* 969 F.2d 250, 254 (7th Cir.1992)). In those terms summary judgment is appropriate if the record reveals that no reasonable jury could conclude that Hainke was treated in a statutorily prohibited fashion (see *Fuka v. Thomson Consumer Elecs.,* 82 F.3d 1397, 1402 (7th Cir.1996) and cases cited there). And as the ensuing discussion

demonstrates, that standard dooms Hainke's claims.

What follows in the *Facts* section (and in later factual discussion) is culled from the parties' submissions. And as with every summary judgment motion, this Court accepts nonmovant Hainke's version of any disputed facts where her version is arguably supported by the record.

### Facts

▇ Hainke was hired by public accounting firm Gleeson in June 1994 as part of its Skokie office's administrative staff (G.56.1(a) ¶ 10).[4] Her duties ranged from answering the telephones and receiving mail to billing and accounts receivable work. Mark Sztelle ("Sztelle") was Gleeson's Chief Operating Officer and oversaw the Skokie office's day-to-day activities during the period in question (G.56.1(a) ¶ 11). Hainke received annual performance evaluations during her employment with Gleeson, comprising a self-evaluation, written performance evaluations by co-workers and an oral performance evaluation by Hainke's supervisor (G.56.1(a) ¶ 13).[5]

In August 1996 Hainke was approached by Linda Forman ("Forman"), a member of Gleeson's sexual harassment committee who had heard that Hainke was upset (G.56.1(a) ¶ 39). Upon being told of allegations of improper conduct on the part of

record citations), thus highlighting the existence or nonexistence of factual disputes. This opinion cites to Gleeson's initial statement as "G. 56.1(a) ¶ —" and to Hainke's response as "H. 56.1(b) ¶ —." Citations to any of the parties' other submissions will also use the "G." and "H." designations. Finally, deposition excerpts will be cited by the witness' name and the page number (e.g., "Hainke Dep.—") regardless of whose submission contained the excerpt.

4. It is important to note an issue raised in Gleeson's reply memorandum as to Hainke's 56.1(b) statement. G.R. Mem. 2 suggests that Hainke has not conformed to LR 56.1 because "few, if any, of Plaintiff's denials contradict the statements set forth in Defendant's 12(M) statement." To be sure, many paragraphs in

the H. 56.1(b) statement are stated as blanket denials of numerous facts, supported by statements that do not necessarily contradict every fact in Gleeson's corresponding paragraphs. But Hainke's failure to craft a correctly worded response to certain of those paragraphs will not be fatal to her entire LR 56.1(b) statement. Instead this Court will read the references following any blanket denials in their appropriate context to see just what if anything is being denied. Everything else will be deemed admitted. It would be unduly harsh to condemn the entire H. 56.1(b) statement because of the nature of its charged deficiencies.

5. Sztelle was Hainke's direct supervisor (*id.*), but another person supervised Hainke when Sztelle was out of the office (H.56.1(b) ¶ 11).

some Gleeson employees, Forman asked Hainke to meet with the sexual harassment committee to discuss the problem in more detail (*id.* ¶ 40).[6] After the committee met with the individuals involved (*id.* ¶¶ 44–46), Hainke decided not to file a formal complaint (*id.* ¶ 47).

Several weeks after that meeting Forman again met with Hainke, who then said that the sexual harassment had died down some but had not ceased (H.56.1(b) ¶ 48). Despite being asked, Hainke did not want Gleeson to take any further action on that matter (G.56.1(a) ¶ 48). Hainke asserts that inappropriate comments continued up until the time of her termination, though she did not make any further complaints (H.Mem.4).

In the late summer of 1997 Hainke was diagnosed with mitral valve prolapse (Hainke Dep. 85), a condition that assertedly [7] caused fainting,[8] chest pains, shortness of breath, heart palpitations, always being cold, seizures and a reduced energy level (H.Mem.6). At one point Hainke even wore a heart monitor, a fact known to Gleeson (H.56.1(b)(3)(B) ¶ 25).

In February 1998, after Hainke was terminated, she was diagnosed with fibromyalgia (Hainke Dep. 92). During her employment with Gleeson, that condition had resulted in her having sleeping difficulties, a severely reduced energy level, chronic fatigue, stiffness and aching in the muscles and joints, and irritable bowel syndrome (Hainke Dep. 92–93). Hainke

also suffers from Raynaud's Phenomena, which causes her extremities to fall asleep and for her to be cold most of the time (Hainke Dep. 99–100). Finally, Hainke has nerve damage as the result of an accident that causes pinching and pain in her back (H.Mem.6).

As far back as early 1996 Hainke had begun to arrive late to work on a regular basis (H.Mem.2). Though her scheduled work hours were from 9 a.m. to 5:15 p.m., Hainke wrote on her 1996 performance evaluation that she typically came "in 15 minutes late everyday" (H.56.1(b) ¶ 8).[9] In her August 1996 self-evaluation, under the category of tardiness, Hainke marked the second to lowest category titled "Repetitive Abuse/Sporadic Compliance" (H.56.1(b) ¶ 15). That September Hainke was told in her oral evaluation that Gleeson wanted her to be at work by 9 a.m. (G.56.1(a) ¶ 16). Hainke's performance evaluations by her co-workers during 1996 also included low marks in the tardiness category.[10]

Aside from her tardiness, Hainke provides examples from numerous 1996 and 1997 evaluations that indicate that she performed better than adequate work. One of her 1996 performance evaluations stated that Hainke "has a great attitude and is always accepting new responsibilities" (H.56.1(b)(3)(B) ¶ 2). Another evaluation said that during tax season Hainke "performed outstanding.... [and][ ] consistently worked very late in the evening to

---

**6.** At the meeting Hainke conveyed several examples of improper sexual comments directed by Gleeson employees to her and said that one employee had patted her on the "butt" (G.56.1(a) ¶ 41). Later, in her deposition, Hainke said that "[t]he sexual harassment occurred on a daily basis" (Hainke Dep. 132) and involved eight different individuals (*id.* 128–29).

**7.** For summary judgment purposes this Court will assume that all of Hainke's medical conditions caused the claimed symptoms. Hence the rest of this *Facts* section will not use any qualifying terms such as "asserts."

**8.** While her fainting could occur twice a day during a whole week—though she often went

a whole week without fainting (Hainke Dep. 89)—Hainke has never been under any medical restrictions by her physician because of her mitral valve prolapse (Hainke Dep. 89).

**9.** In her deposition Hainke said that in the beginning of her employment she would be regularly late but not on a weekly basis (Hainke Dep. 116). .

**10.** For example, one co-worker wrote (G.56.1(a) ¶ 18):

Kirsten needs to get to work on time. She seems to get to work later and later. She may make up the time but it also delays other peoples (sic) work.

complete the work that was given to her that day" (H.56.1(b)(3)(B) ¶ 3). Indeed, about half of the H. 56.1(b)(3)(B) statement of additional facts is made up of comments from her co-workers indicating that she was on whole an "above average" employee (see, e.g., 56.1(b)(3)(B) ¶¶ 6–16).

But Hainke's 1997 performance reviews also reflect tardiness as a continuing problem. Hainke again marked the second lowest category under tardiness for her self-evaluation (G.56.1(a) ¶ 19). In Sztelle's notes of Hainke's 1997 oral evaluation, he wrote (G.56.1(a) ¶ 20):

> Being late is a serious problem—has gone on for too long! Kirsten must start promptly at 9 a.m.—serious problem 9:20/9:30 is late—must improve on this.

While Hainke does not contest the existence of that statement in Sztelle's notes, she does deny that such comments were ever made to her during the evaluation process (H.56.1(b) ¶ 20). Nevertheless it is uncontested that Sztelle's written evaluation stated that Hainke should "Keep trying to arrive on time" (G.56.1(a) ¶ 21).

Hainke again received low scores in 1997 from fellow employees under the tardiness category (id. ¶ 25). In one of Hainke's performance reviews a co-worker wrote (G.56.1(a) ¶ 24):

> Always shows 7.5 or more hours. Not sure how she does it when she doesn't get here until 10:00±.

Several co-workers had to take time away from their own responsibilities to answer the telephone from 9 a.m. until Hainke arrived (see Perkins Dep. 39–40, Miller Dep. 39–40). That problem grew worse in the fall of 1997 (Perkins Dep. 38). Gleeson says that Sztelle discussed Hainke's tardiness and the disruption it caused with Gleeson's managing partner George Cumpata ("Cumpata") on numerous occasions (G.56.1(a) ¶ 26).

In June 1997 Hainke asked that her medical insurance be changed from an EPO to a PPO so that she could see certain medical specialists regarding her various conditions (H.Mem.2). Sztelle reviewed and approved Hainke's request (G.56.1(a) ¶ 31). After that change and until November 10, 1997 Hainke had approximately 30 doctors' appointments for the diagnoses and treatment of her various ailments (H.Mem.2).

During the same time frame, in Hainke's last four to six months with Gleeson, she would be late to work on a weekly basis (id.). Indeed, she admits that her tardiness problem "got progressively worse" towards the end of her employment (Hainke Dep. 115–16). On November 10 Hainke met with Sztelle in his office.[11] Hainke contends that Sztelle "interrogated" her as to why, after 30 doctors' appointments, she still did not know what was wrong with her (Hainke Dep. 70–71).[12] Hainke began crying and said, pointing to her heart monitor, "how do you think I feel not knowing what's wrong with me?" (id. 71). Up to that point Hainke had been diagnosed only with mitral valve prolapse, not with fibromyalgia or Raynaud's Phenomena (id. 72).

Hainke continued to be late in the weeks following her meeting with Sztelle.[13] Sztelle and Cumpata discussed the situation, and the decision was made to terminate her employment.[14] On December 5,

11. Though Hainke thought during her deposition that November 12 was the date of the meeting, both parties' LR 56.1 statements say the meeting was on November 10 (G.56.1(a) ¶ 28, H. 56.1(b) ¶ 28).

12. Gleeson says the meeting was to warn Hainke about her excessive tardiness (G.56.1(a) ¶ 28).

13. Though Gleeson asserts that Hainke arrived to work on time only once during that period (G.56.1(a) ¶ 29), Hainke claims that she was "on time on more than one occasion" (H.56.1(b) ¶ 29). Hainke does not however contend that she was on time more often than not.

14. Of course the reason for Hainke's termination is at the heart of this case. Gleeson asserts that Hainke was fired because of her excessive tardiness. Sztelle says that he recommended to Cumpata that Hainke be discharged for excessive tardiness and that Cumpata approved his recommendation (Sztelle

1997, less than a month after her meeting with Sztelle, Hainke was formally discharged (Hainke Dep. 27).

## ADA Claim

 Hainke contends she was terminated because of her various medical conditions, which she says amount to an ADA "disability." But Hainke's claim fails at the very threshold of ADA analysis: the need to show that she is "disabled" in the statutory sense.[15]

Section 12102(2) defines an individual's "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

Hainke lays claim to disability status under the rubric of either (A) or (C). Although ADA does not itself define Section 12102(2)'s key terms, the ADA regulations provide guidance that the case law has honored as definitive. Reg. § 1630.2(i) defines "major life activities" to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." And under Reg. § 1630.2(j)(1) the term "substantially limits" describes a person who, as compared with the average person in the general population, is either "unable to perform a major life activity" or is "[s]ignificantly restricted as to the condition, manner or duration under which [that] individual can perform a major life activity." [16]

Although Hainke has to be sure asserted the existence of several impairments (mitral valve prolapse, fibromyalgia, Raynaud's Phenomena and nerve damage), she has not identified any major life activity that is substantially limited by those impairments.[17] H. Mem. 6–7 suggests that the various ailments affect major life activities such as breathing and walking and that Hainke's chronic fatigue impaired her ability to care for herself. But that argument misses the mark. As *Skorup v. Modern Door Corp.*, 153 F.3d 512, 515 (7th Cir.1998)(emphasis added) observes, in that context ADA prescribes that Hainke "provide some evidence establishing a genuine issue of material fact over whether her condition resulted in her being *substantially limited from employment generally.*"

Here Hainke has not highlighted any evidence indicating that her impairments substantially limited her in the workplace. More specifically, she has not proffered any showing that her chronic fatigue and sleeping problems were the cause of her tardiness or that going to bed earlier could not alleviate that problem (H.App.Ex. K–16).[18] Quite the contrary, it is clear that

---

Dep. 29). Cumpata says he made the decision to discharge Hainke (Cumpata Dep. 22) premised on Sztelle's assertion that Hainke's "tardiness was causing disruption within the office staff" (*id.* 19–21).

**15.** At this summary judgment stage, of course, Hainke need not "establish" or "prove" anything. Instead she must merely demonstrate the existence of a genuine issue of material fact to defeat Gleeson's summary judgment motion. Although this opinion will most frequently employ one of those quoted terms because that is the terminology used by the cited cases, it consistently imposes that lesser burden in testing Hainke's claims.

**16.** Reg. § 1630.2(j)(2) further prescribes three factors to be considered in determining

whether an individual is substantially limited in a major life activity:

　(i) The nature and severity of the impairment;

　(ii) The duration or expected duration of the impairment; and

　(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting form the impairment.

**17.** *Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1454 (7th Cir.1995) is one of many cases teaching that not every "impairment" is necessarily an ADA "disability."

**18.** Hainke does not attempt to argue that her impairments affected her ability to be at work on time—the only contention that could potentially be made, based on the record, to connect her ailments to a substantial limitation in the workplace.

her ailments do not necessitate her arrival at work after 9 a.m., because the job she took after leaving Gleeson[19] required her to start at 8 a.m. (G.56.1(a) ¶ 55). Further, Hainke has stated that neither the mitral valve prolapse nor the fibromyalgia interfered with her ability to perform her new job (G.56.1(a) ¶ 55, Hainke Dep. 96–97). So Hainke has not shown that she is substantially limited in any major life activity that affects her ability to work.[20]

Hainke's alternative approach is to say that she is disabled under Section 12102(2)(C): that Gleeson regarded her as having a disability that substantially limited a major life activity. *Skorup,* 153 F.3d at 515 (adapted to this case) sets out Hainke's burden on that issue:

> It is not enough for [Hainke] to show that [Gleeson] was aware of her impairment; instead [Hainke] must show that [Gleeson] knew of the impairment and believed that she was substantially limited because of it.

Thus Hainke "must show that [Gleeson] believed that she was unable to work a particular class or broad range of jobs" (*id.*).

In support of that contention, H. Mem. 7 simply points to Hainke's having told Gleeson that her ailments were the reason for her tardiness.[21] But no evidence has been offered that Hainke's statement to Gleeson would indicate a substantial workplace limitation. Sztelle says that Hainke never elaborated on how her illness prevents her from arriving on time (H.App.Ex. K–16), and Hainke does not contend that she did. Nor is there any evidence to suggest that Gleeson perceived Hainke as possessing that type of impairment.

Although Section 12102(2)(C) speaks of Gleeson's subjective beliefs, an objective look at Hainke's argument independently confirms its incredible nature. Hainke's position is that Gleeson thought her impairments (presumably resulting in her chronic fatigue and difficulty sleeping) limited her ability to be at any job before 9:15 a.m. and that the limitation was substantial. Such an argument, given the lack of any evidentiary support, is one that no reasonable jury could accept.

Because Hainke has not produced sufficient evidence to create a genuine issue of material fact as to whether she is substantially limited in any major life activity or whether Gleeson regarded her as such, Gleeson's motion for summary judgment on Hainke's ADA claim succeeds. That claim must be dismissed.

### *ERISA Claim*

■ ERISA § 510 provides in part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan. . . .

Hainke contends that Gleeson violated that prohibition by firing her to bar her access to employee benefits. On that score *Lindemann v. Mobil Oil Corp.,* 141 F.3d 290, 295 (7th Cir.1998) requires Hainke to show that Gleeson "terminated [her] with the specific intent of preventing or retaliating for the use of benefits." In other words, Hainke must establish that Gleeson "made a conscious decision to interfere with [Hainke's] attainment of . . . benefits" (*id.,*

---

19. Hainke was employed by Wally's Auto Body Carstar, but she has since left that job (G.56.1(a) ¶ 55, H. 56.1(b) ¶ 55).

20. H. Mem. 7 also urges that the determination of what is a disability under ADA is a factual one. Such a proposition would torpedo every motion for summary judgment on the issue, and it has never been the law.

21. Hainke also states that Gleeson was aware that she had worn a heart monitor and might have to have surgery. That adds little to her argument, because demonstrating an employer's knowledge of an impairment is only the first step for Section 12102(C) purposes. As already explained, Hainke must also demonstrate that she was perceived to be substantially limited in her work because of the impairment.

quoting *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 347 (3d Cir.1990)).

To make out a prima facie case under ERISA § 510, *Lindemann*, 141 F.3d at 296 (quoting *Grottkau v. Sky Climber, Inc.*, 79 F.3d 70, 73 (7th Cir.1996)) prescribes that Hainke must establish that she:

> (1) belongs to the protected class; (2) was qualified for [her] job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate was present.

To demonstrate intent, "proof of pretext is required" (*id.*, quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 643 (7th Cir.1995)(quotations omitted)). Circumstantial evidence of pretext is allowed in the context of the familiar *McDonnell Douglas* burden-shifting approach (*id.*).[22] Here, because Gleeson has certainly advanced a legitimate, nondiscriminatory reason for terminating Hainke,[23] it is unnecessary to examine whether Hainke has established a prima facie case (*id.*). This opinion instead turns directly to whether Hainke can demonstrate that Gleeson's stated reasons for terminating her were a pretext for disability-based discrimination.

H. Mem. 13 contends that the fact of Hainke's termination within a month after Gleeson learned of her medical condition and that she might have to undergo heart surgery creates an inference of "prohibited intent." But such mere knowledge, in the face of Hainke's long-standing deficiency *and* Sztelle's *pre*-meeting evaluation that her "serious problem…has gone on for too long!" lacks the causal element of a "conscious decision" to interfere with Hainke's benefits. Though to be sure Hainke is entitled to reasonable inferences in her favor, she seeks instead to draw unreasonable inferences.

Thus Hainke also fails to establish a prohibited intent, because she has not demonstrated that Gleeson's asserted motive for termination was mere pretext.[24] Because once more no genuine issue of material fact exists, Gleeson's motion for summary judgment on Hainke's ERISA claim is also granted. That claim too must be dismissed.

### Hostile Work Environment Sexual Harassment Claim

■ Hainke also claims that she was subjected to hostile work environment sexual harassment. But the heart of that claim is time-barred because Hainke did not file an EEOC charge within 300 days of her alleged harassment. Hainke was required to have done so if the harassment had been "sufficiently palpable that a reasonable person would realize she had a

---

22. Under that framework, if Hainke succeeds in setting forth a prima facie case, Gleeson must articulate a legitimate, non-discriminatory reason for discharging her. If it does so, then the burden of production reverts to Hainke (who always retains the burden of persuasion) to show that the proffered reason is actually a pretext for discrimination (see, e.g., *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 792 (7th Cir.1997)).

23. As discussed extensively in the *Facts* section, Gleeson has put forth evidence that Hainke had constant problems with arriving at work on time and that her tardiness did not improve even after numerous evaluations had highlighted that problem to her. Gleeson thus succeeds in shifting the burden to Hainke because "[a]bsenteeism and tardiness have been recognized by this Court [of Appeals] as legitimate, nondiscriminatory rea-

sons for an employer to terminate an employee" (*Lindemann*, 141 F.3d at 296). Though Hainke attempts to inject into the argument the fact that she received a good deal of positive feedback from Gleeson (see H. Mem. 1–3, 8), it is not this Court's role to second guess the business judgment of an employer once valid grounds for termination exist.

24. Indeed, even if the circumstances cited by Hainke were viewed as showing mixed motives on Gleeson's part, it would still prevail if "the same action would still have been prompted by wholly legitimate motives" (*Teumer v. General Motors Corp.*, 34 F.3d 542, 550 n. 4 (7th Cir.1994)). Certainly Gleeson would prevail on that account in light of the paucity of Hainke's evidence and the totality of evidence submitted by Gleeson supporting its contention that Hainke's absenteeism was the basis for her termination.

substantial claim under Title VII" (*Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1166 (7th Cir.1996)).

■ Hainke does not contest that proposition—she rather attempts to salvage her claim by highlighting conduct that falls within the 300–day time frame. But what remains in the form of Hainke's non-time-barred claim is not the stuff of which Title VII claims are made. With Hainke's original January 6, 1998 filing with the Illinois Department of Human Rights (H.56.1'(b) ¶ 54) as the triggering date, only conduct after March 13, 1997 is at issue—and that renders nonactionable all conduct before Hainke's meeting with the sexual harassment committee.[25]

H. Mem. 14 suggests that Hainke's claim can survive based on her imprecise comment to Forman that the harassment had subsided some but not ceased and her generalized assertion that the harassment continued up until her termination. But that conclusory type of subjective assertion, unsupported by any specifics at all, cannot do the essential Rule 56(e) evidentiary job of identifying harassment that was objectively hostile—that was "sufficiently severe or pervasive" (*Adusumilli v. City of Chicago,* 164 F.3d 353, 361 (7th Cir.1998)). Because Hainke's vague statements are clearly insufficient in that respect, her hostile work environment sexual harassment claim fails as well. That claim too must be dismissed with prejudice.

### Title VII Retaliation Claim

■ Hainke's last claim, that she was fired in retaliation for complaining about the sexual harassment, suffers from the same defect as her like ERISA claim: the failure to establish a causal link between her termination and any statutorily protected right. To establish a prima facie case, *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1038 (7th Cir.1998) requires Hainke to establish that:

(1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action.

With the third element in dispute, H. Mem. 14 asserts that Sztelle's awareness of Hainke's complaint establishes the requisite link, because he was the person who decided to terminate Hainke. But in this instance Hainke was discharged at least 15 months after she voiced her complaint[26] (see *Sweeney v. West,* 149 F.3d 550, 557 (7th Cir.1998)(internal quotation marks omitted), reconfirming that a "telling temporal sequence can establish the required nexus" only if "the employer's adverse action follows fairly soon after the employee's protected expression"). And Gleeson's knowledge of Hainke's complaint is alone not enough to create a reasonable inference of discriminatory conduct. As *Sanchez v. Henderson,* 188 F.3d 740, 747 (7th Cir.1999) observes:

[M]ere knowledge of the plaintiff's protected activity prior to an adverse employment action does not establish a retaliatory motive.

So Gleeson succeeds in its motion for summary judgment on Hainke's final claim. It, like the others, must be dismissed.

### Conclusion

Hainke has not identified a genuine issue of material fact that could establish any of her various claims. Hence Gleeson "is entitled to a judgment as a matter of law" (Rule 56(c)) as to all of Hainke's

---

25. In the hostile work environment context this Court has confirmed that conduct antedating the 300–day period can still be viewed as *evidence* of a discriminatory mindset, because "the very notion of a hostile environment is necessarily cumulative in nature" (*Hawthorne v. St. Joseph's Carondelet Child Ctr.,* 982 F.Supp. 586, 593 (N.D.Ill.1997)).

But such evidence must still be linked to timely-asserted actionable conduct within the statutory period.

26. As described in the *Facts* section, Hainke "complained" only after she had been approached by Forman, a member of Gleeson's sexual harassment committee.

claims. This entire action is dismissed with prejudice.